UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TRAVIS COLLINS                                CIVIL ACTION

VERSUS                                        NO: 15-1468

NEW ORLEANS HOME FOR                          SECTION: "J"(1)
INCURABLES

## ORDER & REASONS

Before the Court is a *Motion for Summary Judgment* (**Rec. Doc. 58**) filed by Defendant, New Orleans Home for Incurables, doing business as the John J. Hainkel, Jr. Home & Rehabilitation Center ("Defendant"); an *Opposition* thereto (Rec. Doc. 73) by Plaintiff, Travis Collins ("Plaintiff"); a *Reply Memorandum* filed by Defendant (Rec. Doc. 67); a *Surreply* filed by Plaintiff (Rec. Doc. 78); and a *Supplemental Memorandum* filed by Defendant (Rec. Doc. 79). Having considered the motion, the parties' submissions, the record, and the applicable law, the Court finds, for the reasons expressed below, that the motion should be **GRANTED.**

## PROCEDURAL AND FACTUAL BACKGROUND

This matter arises out of claims brought by Plaintiff regarding the use of a power wheelchair. Plaintiff is a paraplegic as a result of a gunshot wound which he incurred at the age of fifteen. Since approximately 1996, Plaintiff has resided at a nursing home ("Hainkel Home"), which is owned and operated by Defendant. Plaintiff alleges that during the majority of his

residency at Hainkel Home, he transported himself via a power wheelchair, which allowed him to travel within and outside of Hainkel Home. As a paraplegic, Plaintiff has a limited ability to ambulate via a manual wheelchair, and such movement causes Plaintiff pain. Plaintiff further alleges that in 2013, his power wheelchair stopped working and became inoperable. Plaintiff's friends purchased Plaintiff a new power wheelchair by making payments for the power wheelchair directly to Defendant, who would in turn purchase the power wheelchair. On April 7, 2014, Defendant used the money donated by Plaintiff's friends to purchase Plaintiff a new power wheelchair.

From April 2014 until July 2014, Plaintiff used the newly purchased power wheelchair. The parties dispute how safely Plaintiff operated the power wheelchair during this period, both in Hainkel Home and in the community. Ms. Fannie Denson, the facility driver at Hainkel Home, reported that Plaintiff operated the power wheelchair dangerously. (Rec. Doc. 58-23, at 7-8). Ms. Denson testified that she witnessed Plaintiff "run[] out into traffic" and nearly get hit by vehicles in the streets of New Orleans several times. *Id.* at 8. Defendant also refers the Court to the deposition of Mary Brooks Rodrigue, President and Chairman of Hainkel Home, who testified that she received ten phone calls from people in the community who saw Plaintiff "racing out of nowhere" unsafely in the streets. *Id.* at 9.

Plaintiff disputes this characterization. He avers that when he traveled in the community, Plaintiff would sometimes come across obstacles that would make people in the area believe he was having trouble, but that these were usually situations he could handle without help. (Rec. Doc. 73-1, at 5). Plaintiff also contends that he operated the power wheelchair safely during that three month period, that he was careful when crossing intersections, and that he never received any ticket or warning from the police.

In late July 2014, Hainkel Home administrator Robert Rodrigue observed Plaintiff as he returned to Hainkel Home from an outing in the power wheelchair. Mr. Rodrigue noticed at this time that the power wheelchair was damaged, though the parties dispute the extent of damage. On July 20, 2014, Hainkel Home staff noted in a Plan of Care document regarding Plaintiff that the power wheelchair was inoperable and that Plaintiff was to use a manual wheelchair for mobility. (Rec. Doc. 58-23, at 5). Plaintiff states that he has not operated the power wheelchair since it was taken into possession by Hainkel Home staff in late July 2014.

On August 12, 2014, a nurse practitioner entered a telephonic order stating, "Based upon operations specialist and physical therapist evaluation for safe operations of electric wheelchair, resident deemed unsafe. Use manual wheelchair to facilitate safe mobility via staff." (Rec. Doc. 58-23, at 10). Dr. Parikh, Plaintiff's attending physician, countersigned this order on or

3

about August 15, 2014.  In May 2015, Plaintiff fired Dr. Parikh as his attending physician, and in that same month he hired Dr. Lacorte in that position.  Dr. Lacorte has remained Plaintiff's attending physician ever since.  To date, Dr. Lacorte has not written his own separate order regarding Plaintiff's power wheelchair use, nor has he revised or countermanded the order countersigned by Dr. Parikh.

Plaintiff filed the present lawsuit in this Court on May 4, 2015.  In his Complaint, Plaintiff alleges that by depriving him of the use of his power wheelchair, Defendant has violated the Fair Housing Act, Title III of the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act).  Plaintiff also asserts causes of action for conversion and breach of contract under Louisiana law.  As a result of these alleged violations, Plaintiff seeks declaratory and injunctive relief as well as specific performance under state law. Plaintiff also seeks statutory attorneys' fees and costs.

In response, Defendant has filed the instant motion for summary judgment requesting judgment in its favor with respect to Plaintiff's ADA, Rehabilitation Act, and Fair Housing Act claims. Defendant also requests that this Court decline to exercise its supplemental jurisdiction over the remaining state law claims.

**PARTIES' ARGUMENTS**

Defendant asserts that the decision to deny Plaintiff access to his power wheelchair was made by Plaintiff's physicians, not by Defendant. As such, Defendant argues that it could not have discriminated against Plaintiff by following the order of Plaintiff's attending physicians, whom Defendant asserts are third parties.

In his opposition, Plaintiff first disputes the fundamental issue of whether a physician order exists at this time ordering Plaintiff not to use a power wheelchair. Next, Plaintiff argues that the decision to deny Plaintiff use of the power wheelchair was Defendant's own decision, not Dr. Lacorte's, and that Defendant should therefore not escape liability on that ground.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide*

*Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a

6

genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

## **AMERICANS WITH DISABILITIES ACT, REHABILITATION ACT, AND FAIR HOUSING ACT**

As described above, Plaintiff brought claims against Defendant for violations of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)B); Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, (ADA); and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Rehabilitation Act). All three statutory schemes prohibit discrimination, and ultimately engage in the same inquiry. The parties have not distinguished between statutes in their arguments nor suggested that they be interpreted differently. *See Ivy v. Williams*, 781 F.3d 250, 254 (5th Cir. 2015) (stating that "the parties have not pointed to any reason why Title II [of the ADA] and the Rehabilitation Act should be interpreted differently," and therefore determining that the court's holding would apply to both statutes) (internal citations omitted).

"The [Rehabilitation Act] and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). Therefore, although the Court primarily emphasizes Title III of

7

the ADA, the "analysis is informed by the Rehabilitation Act, and our holding applies to both statutes." *Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011). Additionally, because the Fair Housing Act statute in question focuses on "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling," its focus fits squarely with the other two Acts. *See* 42 U.S.C. 3604(f)(3)(B). It is for this reason that often "the ADA, Rehabilitation Act, and [Fair Housing Act] are considered in tandem." *Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) (summary order); *see also Allen v. New York City Hous. Auth.*, No. 15-173, 2016 WL 722186, at *6 (S.D.N.Y. Feb. 19, 2016) (noting that the three statutes were applicable in failure to accommodate claims); *United States v. City of New Orleans*, No. 12-2011, 2013 WL 1767787, at *4 n.1 (E.D. La. April 24, 2013) ("[The FHA and ADA] are often interpreted in tandem.") Likewise, this Court interprets the three statutes in tandem, while focusing on Title III of the ADA.

## TITLE III OF THE ADA

The ADA provides a broad mandate "to eliminate discrimination against disabled individuals and to integrate them into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001) (internal citations omitted).

8

The ADA consists of three main sections, each forbidding discrimination in a major area of public life. *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004). Title I addresses employment, Title II addresses public services, programs, and activities, and Title III addresses public accommodations. *Id.*

Title III establishes that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). To enforce this mandate, Congress tasked the Department of Justice with promulgating regulations applicable to facilities and vehicles. 42 U.S.C. § 12186(b). The regulations provide detailed standards for the use of wheelchairs: "a public accommodation shall permit individuals with mobility disabilities to use wheelchairs . . . or other similar devices designed for use by individuals with mobility disabilities in any areas open to pedestrian use." 28 C.F.R. § 36.311. The word "wheelchairs" incorporates both the power-driven and manually-operated varieties, and therefore references to wheelchairs apply to both types. 28 C.F.R. § 36.104.

Most Title III claims by wheelchair users are alleged against private entities that fail to provide adequate wheelchair accessibility. *See, e.g., No Barriers, Inc. v. Brinker Chili's*

9

*Texas, Inc.*, 262 F.3d 496 (5th Cir. 2001). In fact, the parties do not point to, nor was this Court able to identify, a Title III case where, as here, the plaintiff demands that the public accommodation allow him to use his own wheelchair and to transfer him into and out of his wheelchair.[1] Nevertheless, the language of Title III generally, and 28 C.F.R. 311 in particular, is broad enough to capture this case so long as Defendant discriminated against Plaintiff because of his disability and refused to permit him to use his power wheelchair in areas open to pedestrian use.

## THE EXISTENCE OF A PHYSICIAN ORDER

The foundational question in this case is whether a physician order is currently in place precluding Plaintiff from using the power wheelchair. This is of primary significance because at least some of the parties' arguments hinge upon the existence, or not, of a physician order, and the other arguments are strengthened by the Court's holding on this question. Therefore, the Court takes up this issue first.

---

[1] The closest case identified by the parties appears to be *Roberts v. McKinney*, where the plaintiff was an inmate in a correctional facility in Arkansas. No. 13-6134, 2015 WL 1208625, at *1 (W.D. Ark. Mar. 17, 2015). In that case, the plaintiff claimed that due to his disability he required the use of a power wheelchair for mobility, but that the administrators of the correctional facility refused to accommodate him. *Id.* Plaintiff, acting pro se, brought the claim under Title II of the ADA and on other grounds. *Id.* As to the ADA claim, the court granted the defendants' motion to dismiss without discussion because the court found that the deputy director of the prison could not be sued in her individual capacity under Title II. *Id.* at *5. Because the court relied specifically on the fact that the plaintiff brought suit under Title II yet sued the defendants in their individual capacities, to reach its conclusion, that case is of limited applicability here.

10

Plaintiff argues that no physician order is currently in place precluding Plaintiff from using the power wheelchair. Plaintiff's argument relies upon the following undisputed facts. As described above, a nurse practitioner entered a telephonic order stating that Plaintiff was deemed unsafe to use an electric wheelchair and directing Plaintiff to use a manual wheelchair to facilitate safe mobility on August 12, 2014. On or about August 15, 2014, Plaintiff's attending physician, Dr. Parikh, countersigned this order.

Plaintiff subsequently fired Dr. Parikh as his attending physician and in May 2015, Plaintiff hired Dr. Lacorte in that position. Dr. Lacorte has never written an order regarding Plaintiff's use of power wheelchairs.[2] Dr. Lacorte testified that

---

[2] In Dr. Lacorte's Deposition, the following exchange occurred:

> QUESTION: Have you ever written an order concerning Travis Collins and his using or not using a power wheelchair?
>
> DR. LACORTE: I have no recollection of that although let me say this. I did not write an order to use a wheelchair.
>
> QUESTION: Did you write an order concerning a power wheelchair?
>
> DR. LACORTE: I don't have the orders with me so I don't remember.
>
> . . .
>
> QUESTION: And if you had written an order concerning Mr. Collins using or not using a power wheelchair, would it be contained in the Hainkel Home records?
>
> Dr. LACORTE: Yes, it would be in either the long order sheet or the short order sheet.

the "decision [to preclude Plaintiff from using the power wheelchair] was made by Hainkel Home and the previous doctor . . . before I assumed his care." (Rec. Doc. 73-2, at 6). However, Dr. Lacorte also testified that Plaintiff's ability to operate a power wheelchair is "a question of whether he's safe to operate a motorized vehicle and regretably [sic] - - well, I don't think he is in my expert opinion." (Rec. Doc. 58-17, at 13).

Neither party defines "order" nor points to legal precedent regarding whether such an order would survive the transfer of an attending physician. Defendant relies upon regulations provided by the Centers for Medicare and Medicaid Services (CMS) for guidance regarding physician orders. (Rec. doc. 67-1, at 3). While making a separate argument than whether an order exists, Defendant briefly refers to CMS regulations.[3] *Id.* Therefore, this Court finds that CMS publications may be helpful in articulating the definition of a physician order.

For purposes of the Medicare program, no general statutory definition exists for "physician order" or "order." *See* Timothy P. Blanchard and Margaret M. Manning, *Evolving Medicare Policy on Physician Orders: Fundamental Concepts but Higher Stakes*, 2014 Health L. Handbook 13 (2014). Rather, a "physician order" is

---

(Rec. Doc. 73-2, at 5-6). Neither Party has suggested that any order from Dr. Lacorte is in the Hainkel Home records in long order nor short order form.
[3] Defendant directs the Court's attention to CMS regulation in supporting its argument that Defendant is obligated to abide by physician orders. (Rec. Doc. 67-1, at 3).

12

commonly referred to as a communication from a physician (generally the treating or attending physician) directing that a service be provided to the patient. *See id.* (referring to Ctrs. for Medicare & Medicaid Servs., Publ'n No. 100-02, *Medicare Benefit Policy Manual,* ch. 15, § 80.6.1 (222d rev.2016) (defining order in the context of diagnostic tests)).

Defendant refers to the order as a "standing order."[4] (Rec. Doc. 58-23, at 23) Although there is no agreed upon statutory definition of standing order, this term is commonly understood to be a "tool[] used by physicians to ensure that patients consistently get the care they need over a period of time, without the physician having to be present on a daily or hourly basis" to constantly effectuate a re-order. Christopher Young, *Laboratory Standing Orders*, 9 J. Health Care Compliance 65 (2007). Medicare Condition of Participation regulations provide guidance on when standing orders may be used, at least in the context of hospitals. 42 C.F.R. § 482.24. In pertinent part, Medicare requires that hospitals "Ensure[] that the periodic and regular review of such orders and protocols is conducted by the medical staff and the hospital's nursing and pharmacy leadership to determine the continuing usefulness and safety of the orders and protocols . . . ." *Id.* CMS comments provide further guidance: "We would expect

---

[4] Plaintiff disputes this characterization of the order as far as it relates to the period from which Dr. Lacorte became Plaintiff's attending physician. (Rec. Doc. 73-1, at 16).

[a hospital's] policies and procedures to [] address the process by which a standing order is developed; approved; monitored; initiated by authorized staff; and subsequently authenticated by physicians or practitioners responsible for the care of the patient." U.S. Dep't. of Health and Human Serv.s, Proposed Rules, 76 Fed. Reg. 65891, 65896 (Oct. 24, 2011).

The Court finds this information instructive. At least in the context of standing orders in hospitals, the Medicare program expects the facility to have policies and procedures to guide the use and effectiveness of standing orders. Presumably, a similar expectation would apply to nursing facilities such as Hainkel Home. Here, without pointing to a specific written policy or directive from Hainkel Home on the issue, Defendant states that physician orders do not lose their effect simply because a patient changes his attending physician. (Rec. Doc. 67-1, at 2).

Plaintiff, however, has not presented any evidence to contradict the conclusion that a physician order survives the transfer of an attending physician unless and until the assuming physician countermands, revises, or replaces the existing order. Thus, the Court concludes that the physician order precluding Plaintiff from using the power wheelchair is in effect.[5]

---

[5] The Court notes that this issue could have been easily put to rest by Dr. Lacorte either revising or countermanding Dr. Parikh's order, or by signing a new order. However, as noted, Dr. Lacorte apparently agrees with Dr. Parikh's order.

**DECISION MADE BY THIRD PARTY**

Defendant's first argument is that it could not have engaged in a discriminatory act against Plaintiff because the decision to preclude Plaintiff from using a power wheelchair was made by Plaintiff's physicians, and not by Defendant. (Rec. Doc. 58-23, at 16). Defendant asserts that the decision was made by Plaintiff's attending physicians when Dr. Parikh counter-signed the order and Dr. Lacorte did not revise or countermand it. Defendant states that it is "absolutely obligated" to carry out the order to deny Plaintiff use of the power wheelchair. (Rec. Doc. 79, at 2). Therefore, Defendant suggests that Plaintiff's complaint should not have been directed at Defendant, but rather at Plaintiff's treating physicians who are responsible for the order. *Id.* Defendant supports its position with deposition testimony from Hainkel Home administrator Robert Rodrigue as well as two of Plaintiff's experts that nursing homes are to defer to the treating physician's orders. (Rec. Doc. 58-23, at 16-17).

Defendant points to a CMS regulation regarding long term care facilities, which this Court presumes is applicable to Hainkel Home.[6] 42 C.F.R. § 483.40(b)(3) states that a physician must "sign

---

[6] Neither party addressed in their memoranda whether Hainkel Home is a long term care facility. A long term care facility must qualify as either a skilled nursing facility or nursing facility, as those terms are defined in the Social Security Act. 42 C.F.R. 483.5(a). The Court presumes that Hainkel Home satisfies the requirements to qualify as a long term care facility because Defendant relies upon this regulation and Plaintiff did not challenge this reliance.

15

and date all orders" (except for the administration of influenza and pneumococcal polysaccharide vaccines) for a patient in a nursing home. Standing alone, this regulation appears to provide minimal guidance to nursing homes because it is directed specifically at doctors. However, 42 C.F.R. § 483.40 also states that each resident in a long term care facility "must remain under the care of a physician." Read together, these regulations clearly delineate the responsibilities of the physician and the long term care facility: the physician makes the orders and the long term care facility executes the orders.

The Court has identified scant case law on this issue. In one instance, the Sixth Circuit heard an appeal of a Department of Health and Human Services (HHS) decision affirming a civil money penalty on a skilled nursing facility for violating certain Medicare and Medicaid regulations. *Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743 (6th Cir. 2004). The defendant nursing facility argued that it did not comply with a physician's order because "the residents did not 'need'" the intervention called for in the order. *Id.* at 753. The court "emphatically reject[ed]" this argument, stating that the nursing facility "cannot defend an alleged failure to adhere to a physician's orders by contending those orders are incorrect or misguided." *Id.* The court continued that if the facility believed the order was unnecessary, "the proper course of action is to rework the patient's comprehensive

16

plan of care" before proceeding to litigation. *Id*. To the extent that this case is instructive, it demonstrates that facilities such as Hainkel Home expose themselves to risk of lawsuit and monetary penalty when they fail to carry out physician orders, and should therefore comply with the orders rather than making independent and contrary determinations.

Furthermore, Plaintiff has not provided support for the contention that the decision to preclude Plaintiff from using a power wheelchair was Defendant's and not the physicians'. Rather, Plaintiff cites *Bragdon v. Abbott*, where the Supreme Court instructed courts to "assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments." 524 U.S. 624, 650 (1998). But in *Bragdon*, the defendant was a dentist, not a dental office, and so the Court was never tasked with determining the objective reasonableness of a facility that simply carried out the dentist's order. *Bragdon* does not support the proposition that Defendant should have bypassed the standing order that it was obligated to follow. Instead, *Bragdon* suggests that Plaintiff's complaint is more accurately directed at Dr. Parikh and Dr. Lacorte for issuing and confirming the order.

Therefore, the Court agrees with Defendant that if its only participation in the matter was that of carrying out a physician order, then summary judgment is appropriate. However, Plaintiff

17

argues that Defendant was not a mere bystander in the creation of Dr. Parikh's order.

As discussed above, Dr. Parikh counter-signed a pre-existing order precluding Plaintiff's wheelchair use on August 15, 2014. Plaintiff asserts that Dr. Parikh was induced to make this order, at least in part, by misleading information provided by Defendant. For instance, Dr. Parikh had reservations about Plaintiff's wheelchair use because he had been told by Hainkel Home staff that Plaintiff had flipped out of the wheelchair more than once while attempting to navigate sidewalk ramps. Plaintiff disputes that this ever happened, and the only deposition testimony in the record suggesting that Plaintiff did flip out of the power wheelchair comes from Hainkel Home employees.

Plaintiff also references a report that Defendant obtained, and which Dr. Parikh read prior to signing the order precluding Plaintiff's power wheelchair use. Defendant arranged for a licensed occupational therapist, Kim Zornes, to evaluate Plaintiff's ability to ambulate safely in the power wheelchair. Ms. Zornes assessed the Plaintiff and prepared a "Wheelchair Safety Evaluation" in August 2014. Among Ms. Zornes' conclusions were that Plaintiff's ability to brake the power wheelchair was "poor," he was incapable of maintaining proper seating and positioning within the chair, and he unsafely operated the power wheelchair in various situations and places. Dr. Parikh read the Wheelchair

Safety Evaluation, though the extent to which he relied upon it is not specified.[7] In his deposition testimony, however, Dr. Parikh stated that he assumed Ms. Zornes "must have" observed Plaintiff operate the power wheelchair in the community as she prepared the report. In fact, Ms. Zornes never observed Plaintiff operate the power wheelchair in the community, but instead observed him only inside Hainkel Home.

Even if Dr. Parikh based his decision to create the order on misleading information found in the Wheelchair Safety Evaluation, no evidence has been presented that Defendant played a role in providing this misinformation. Therefore, any shortcomings that may be present in the Wheelchair Safety Evaluation would be attributable to its author.

## CONCLUSION

Because the Court finds that the decision to preclude Plaintiff from using a power wheelchair was made by Plaintiff's attending physicians Dr. Parikh and Dr. Lacorte, and not by Defendant, Defendant could not have discriminated against Plaintiff by carrying out the physician order.

**IT IS ORDERED** for these reasons that Defendant's *Motion for Summary Judgment* **(Rec. Doc. 58)** as to the ADA Title III,

---

[7] As stated above, the order states: "Based upon operations specialist and *physical therapist evaluation for safe operations of electric wheelchair*, resident deemed unsafe. Use manual wheelchair to facilitate safe mobility via staff" (emphasis added). Presumably, the physical therapist evaluation referenced by the order is Ms. Zornes' Wheelchair Safety Evaluation.

Rehabilitation Act, and FHA claims is **GRANTED**.[8] All federal claims are dismissed with prejudice.

**IT IS FURTHER ORDERED** that this Court exercises its discretion not to entertain Plaintiff's state law claims. These claims are dismissed without prejudice.

New Orleans, Louisiana this 14th day of October, 2016.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[8] Because the Court grants summary judgment on Defendant's first argument, Defendant's medical decision making and direct threat arguments will not be addressed. The Court expresses no opinion on these arguments.